UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JEREL ROGERS, on Behalf of Himself and All Others Similarly Situated, | ) ) ) | Civil Action No. |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| | ) | CLASS ACTION COMPLAINT |
| vs. | ) ) | |
| VOLKSWAGEN AG, VOLKSWAGEN GROUP OF AMERICA, INC., MARTIN WINTERKORN, MICHAEL HORN and DOES 1-25, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Jerel Rogers ("Rogers" or "Plaintiff"), on behalf of himself and all others similarly situated, bring this action against defendants Volkswagen AG ("VW AG"), Volkswagen Group of America, Inc. ("VW America") (collectively, "VW"), Martin Winterkorn ("Winterkorn") and Michael Horn ("Horn") (collectively, "Defendants" or "Volkswagen"). Plaintiff alleges the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## INTRODUCTION

1. This nationwide consumer class action arises out of Volkswagen's brazenly illegal scheme to increase its market share and revenues by rigging smog tests here in the United States. The revelation of the auto titan's fraudulent scheme to beat out its competition by playing dirty with so-called "clean" diesel cars has sent shockwaves worldwide. As we now know, Volkswagen intentionally designed certain of its diesel engines to detect when the vehicle is undergoing emissions testing and temporarily simulate compliance with emissions standards. But when the test is over, and the driver is back on American roads, the car once again spews hazardous, smog-forming pollution at *10 to 40 times* the legal limits.

2. To perpetuate its scheme, Volkswagen installed defective diesel engine systems containing a "defeat device" in approximately 500,000 vehicles sold and/or leased in the United States from 2009 to 2015 (the "Defective Vehicles"). This device was designed to allow the Defective Vehicles to spew dangerous nitrogen oxide while in normal operation and to manipulate engine performance when it detected testing to simulate compliance with emission standards. However, this compliance was only possible during emissions testing, and not in regular use. This was no accident. As recently admitted by defendant Horn at Congressional hearings, the defeat device "was installed for this purpose, yes."[1]

3. Perhaps what is most abhorrent about Volkswagen's illegal and fraudulent scheme is that its entire advertising campaign was built around providing industry-leading "clean" diesel vehicles in an era of concern about climate change and the environment. Yet, despite advertising its

---

[1] *See* http://www.npr.org/sections/thetwo-way/2015/10/08/446861855/ volkswagen-u-s-ceo-faces-questions-on-capitol-hill (last visited on Oct. 16, 2015).

diesel vehicles as being low emission and environmentally friendly, with high fuel economy and exceptional performance, Volkswagen instead intentionally delivered Defective Vehicles that emitted up to 40 times more pollutants than allowed under EPA and California standards. And to avoid detection, Volkswagen installed the defeat devices and, for years, enjoyed an advantage over its competition by claiming innovations in low-emission technology without sacrificing high fuel efficiency and performance. This type of Dystopian cynicism is beyond what consumers could have ever imagined, much less detected.

4. And for a time, its crime seemingly paid – Volkswagen became the world's top automaker for the first half of 2015, and is now one of the largest sellers of diesel passenger vehicles in the United States.[2] According to the Volkswagen website, Volkswagen has sold more diesel cars in the United States than every other brand combined.[3]

5. As a result of Volkswagen's illegal and fraudulent conduct, the Defective Vehicles emit far more toxic pollutants than disclosed by Volkswagen in its warranties, advertisements, and brochures. And, as a result, "there are half a million cars running an emissions setup that ***never should've left the factory***."[4] Each of these Defective Vehicles is also illegal and never should have been sold because Volkswagen did not obtain a valid EPA certificate of conformity due to its fraud. Since the revelation of Volkswagen's unthinkable scheme, the DOJ and at least 45 state attorneys general have announced that they are investigating Volkswagen's conduct, along with other criminal and civil investigations across the globe.[5]

6. Volkswagen's crime has also taken a human toll. Reportedly, the pollution spewed by the Defective Vehicles has caused "somewhere between 16 and 94 deaths over seven years, with

---

[2]  http://www.timesfreepress.com/news/business/aroundregion/story/2015/ sep/21/volkswagen-stops-selling-2015-diesel-cars-20-liter-engines/326259/ (last visited on Sept. 28, 2015).

[3]  http://www.vw.com/features/clean-diesel/ (last visited on Sept. 21, 2015).

[4]  http://www.popularmechanics.com/cars/a17430/ezra-dyer-volkswagen-diesel-controversy/ (last visited on Sept. 28, 2015).

[5]  http://www.bloomberg.com/news/articles/2015-10-08/texas-sues-volkswagen-claiming-deception-emissions-violations-ifiqscqq (last visited on Oct. 16, 2015).

the annual count increasing more recently as more of the diesels were on the road. The total cost is well over $100 million."[6]

7.    Plaintiff and the Class (defined below) were induced to purchase or lease illegal Defective Vehicles that violate the Clean Air Act and state law, and do not perform as represented by Volkswagen or as required by law.  Plaintiff is disgusted and angry.  No one would have purchased these vehicles but for Defendants' illegal scheme as Defendants could not obtain valid EPA certificates of conformity without the hidden defeat devices.  Alternatively, Plaintiff and the Class would not have paid as much for these Defective Vehicles.  Plaintiff has suffered a steep diminution in value of his Defective Vehicles as the vehicles do not, and cannot, perform as advertised and are likely subject to heightened maintenance requirements.[7]  Although Volkswagen is reportedly initiating a recall of the Defective Vehicles in 2016, it cannot comply with EPA emission standards without negatively impacting other vehicle specifications, like fuel economy and horsepower.  Plaintiff will thus suffer from increased fuel costs, and the Defective Vehicles will still not perform as advertised.

8.    Plaintiff and the Class are consumers who purchased or leased a Defective Vehicle containing a defective Clean Diesel engine system with a defeat device and/or other auxiliary emissions control devices, including but not limited to:

| Year | Make & Model(s) |
|---|---|
| 2009 | Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI |
| 2010 | Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, and Audi A3 |
| 2011 | Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, and Audi A3 |

---

[6]    http://www.businessinsider.com/ap-ap-analysis-vw-evasion-likely-led-to-dozens-of-deaths-2015-10 (last visited on Oct. 16, 2015).

[7]    Recent articles have suggested that the Defective Vehicles have already lost 13% of their value, and other VW vehicles have also dropped 2%.  *See* http://www.wsj.com/articles/kelley-blue-book-volkswagen-diesel-car-values-decline-13-1444147701 (last visited on Oct. 16, 2015).

| Year | Make & Model(s) |
|------|-----------------|
| 2012 | Volkswagen Beetle TDI, Volkswagen Beetle Convertible TDI, Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, Audi A3, Volkswagen Passat TDI |
| 2013 | Volkswagen Beetle TDI, Volkswagen Beetle Convertible TDI, Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, Audi A3, Volkswagen Passat TDI |
| 2014 | Volkswagen Beetle TDI, Volkswagen Beetle Convertible TDI, Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, Audi A3, Volkswagen Passat TDI |
| 2015 | Volkswagen Beetle TDI, Volkswagen Beetle Convertible TDI, Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, Audi A3, Volkswagen Passat TDI, Volkswagen Golf SportWagen TDI |

9.      Plaintiff, for himself and all others similarly situated, hereby bring this action for violations of the Racketeer Influenced & Corrupt Organizations Act (18 U.S.C. §1961, *et seq.* ("RICO")); fraud by concealment; breach of express and implied warranties under the Uniform Commercial Code, Magnuson-Moss Warranty Act (15 U.S.C. §2301, *et seq.* ("MMWA")).

10.      Defendants' wrongful and illegal acts show a deliberate disregard for the rights or safety of the public.  Defendants had knowledge of facts and/or intentionally disregarded facts that created a high probability of injury to the rights or safety of others, yet Defendants deliberately proceeded to act in conscious or intentional disregard of, and with reckless indifference to, the high degree of probability of injury to the rights or safety of others.  Defendants' conduct entitles Plaintiff and the Class to a significant award of punitive or exemplary damages in this case.

11.      Plaintiff seeks, on behalf of himself and Class members nationwide, monetary damages (including treble damages under the RICO statute), appropriate restitution, injunctive relief, and all other relief deemed appropriate, arising out of Defendants' illegal scheme and conspiracy alleged herein.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. §1331, because Plaintiff's claims arise under the RICO Act, 18 U.S.C. §1962. The Court has diversity jurisdiction because Plaintiff and Defendants reside in different states. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367. This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332(a)(1), as modified by the Class Action Fairness Act of 2005, because Plaintiff and Volkswagen are citizens of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $5,000,000.00, exclusive of attorneys' fees, interest, and costs; and Class members reside across the United States. The citizenship of each party is fully described below.

13. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§1965(b) and (d), and Cal. Code Civ. P. §410.10. This Court has personal jurisdiction over Defendants because they have minimum contacts with the United States and this State, and intentionally availed themselves of the laws of Tennessee by conducting a substantial amount of business throughout the State of Tennessee and this District, including the manufacture, distribution, and/or sale of Defective Vehicles here, and because Volkswagen committed the acts and omissions complained of herein, in part, in the State of Tennessee and this District.

14. Venue is proper in this Court under 28 U.S.C. §1391, because: (i) Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District; and/or (ii) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia*, Defendants' promotion, marketing, distribution and sale of the Defective Vehicles in this District. Defendants sell a substantial amount of automobiles in this District, have dealerships throughout this District, and much of the misconduct occurred in this District. Venue is also proper under 18 U.S.C. §1965(a), because Defendants are subject to personal jurisdiction in this District as alleged above, and Defendants have agents located in this District. Plaintiff Rogers resides in the Northeastern Division of this District and purchased his Defective Vehicle in this District. Additionally, venue is proper in the Northeastern Division of this Division because Plaintiff Rogers resides in Fentress County.

# PARTIES

(a) **Plaintiff**

15.     Plaintiff Rogers is a citizen of Tennessee residing in Jamestown, TN, in the Northeastern Division of the Middle District of Tennessee.  In July of 2013, Plaintiff Rogers purchased a 2013 Passat TDI SE at Signature Volkswagen of Murfreesboro, an authorized Volkswagen dealership in Murfreesboro, Tennessee.  Plaintiff Rogers still owns this vehicle.  Additionally, in January 2013 Plaintiff Rogers purchased a 2013 Jetta TDI at Village Volkswagen of Chattanooga, an authorized Volkswagen dealership in Chattanooga, Tennessee.  Plaintiff Rogers owned this vehicle until or about July of 2013.

16.     Plaintiff chose to purchase/lease his vehicles because the Defective Vehicles were marketed as environmentally friendly, and he relied on the vehicle specifications regarding emissions, fuel economy and horsepower.  Plaintiff relied on the representations of Volkswagen regarding pollution emissions when deciding to purchase/lease the vehicles and had no reason to suspect, at the time, that the defective engine systems contained a defeat device.

17.     Plaintiff would not have purchased/leased his vehicles had he been aware of the "defeat devices" or that the Defective Vehicles did not comply with the advertised specifications regarding pollution emissions and fuel economy, and were not environmentally friendly.

18.     Defendants concealed that every Defective Vehicle contained a defeat device and was illegal to import and/or sell because they otherwise did not meet applicable federal and/or state emissions standards.  Plaintiff, Class members, dealerships, and other distributors or sellers would not have purchased or leased the Defective Vehicles had they been accurately marketed as illegal, and the legality of the vehicles was a fact material to their purchase.

19.     Plaintiff is now stuck with a Defective Vehicle that is out of compliance with emissions standards and contains defeat devices rendering its Clean Diesel engine system defective.  To make matters worse, Plaintiff does not believe that Volkswagen will be able to "fix" the emissions problem, or at least without sacrificing the fuel economy, horsepower, durability, and performance of Plaintiff's Defective Vehicles, which were material features in the advertising of the same and important to Plaintiff's purchasing decisions.  Plaintiff does not believe he or the members

of the Class should have to pay for Defendants' crimes by being saddled with these defective, illegal vehicles.

20.     Instead of supporting diesel as an environmentally-friendly automotive technology, Plaintiff now reasonably fears that Volkswagen has permanently destroyed consumer confidence in diesel technology.

(b)     **Defendants**

21.     Defendant VW AG is a publicly traded German corporation and one of the world's leading automobile manufacturers. VW AG's headquarters is located in Wolfsburg, Germany. VW AG conducts substantial business throughout the United States and in this District, including its control of defendant VW America; its development and procuring of manufacturing plants, including in Chattanooga, Tennessee; its network of dealerships; and its distribution for sale of hundreds of thousands of Defective Vehicles across the United States and in this District.

22.     Defendant VW America is a for-profit corporation that is not publicly traded, organized under the laws of the State of New Jersey and has its principal place of business at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171. VW America does business in all 50 states (and the District of Columbia), including selling thousands of Defective Vehicles in the State of Tennessee. Upon information and belief, Volkswagen's testing and implementation of the defeat devices and fraudulent scheme were carried out, at least in part, by and through a manufacturing center in Tennessee.[8]

23.     At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased, and warranted the Defective Vehicles under the Volkswagen and Audi brand names throughout the United States and the State of Tennessee. Volkswagen and/or its agents designed, manufactured, and installed the engine systems in the Defective Vehicles, which included the defeat device. Volkswagen also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Defective Vehicles.

---

[8]     VW America is not a defendant for the RICO claim alleged in this complaint.

24.     Defendant Winterkorn is a resident of Germany.  Winterkorn was CEO of VW AG until he resigned on September 23, 2015, in the wake of the diesel emissions scandal.  Notably, Winterkorn was widely regarded as a detail-oriented, micromanaging CEO, who "retained control over engineering details that many other CEOs would relinquish fully to deputies."[9]  Winterkorn is being investigated by the German government for allegations of fraud.[10]  Winterkorn reportedly hand-picked the engineers who designed the defeat devices.  Winterkorn received compensation from the illegal scheme and course of conduct based on the revenues and profits from the Defective Vehicles, and Volkswagen's increased market share.  Winterkorn approved, authorized, directed, ratified, and/or participated in the acts complained of herein.  Winterkorn is subject to the personal jurisdiction of this Court as he has availed himself of the laws of the United States and Tennessee through his management and control over VW America as well as the manufacture, distribution, testing, and sale of hundreds of thousands of Defective Vehicles imported and sold across the United States, in this State, and in this District.

25.     Defendant Horn is a resident of Virginia.  Horn is President and CEO of VW America.  Horn received compensation from the illegal scheme and course of conduct based on the revenues and profits from the Defective Vehicles, and Volkswagen's increased market share.  Horn approved, authorized, directed, ratified, and/or participated in the acts complained of herein.  Horn has admitted that he was aware of the vehicles' emissions non-compliance since at least 2014.  On September 25, 2015, VW AG put Prof. Dr. Winfried Vahlan in charge of Volkswagen's North America activities, but Horn was able to keep his job despite media reports that he was being ousted in the wake of the scandal.[11]  Vahlan has now also resigned.

26.     Defendants and/or their agents designed, manufactured, and installed the engine systems in the Defective Vehicles, which included the defeat device and any other auxiliary

---

[9]     http://www.usatoday.com/story/money/cars/2015/09/23/volkswagen-emissions-scandal-martin-winterkorn/72673028/ (last visited on Sept. 28, 2015).

[10]     http://www.reuters.com/article/2015/09/28/us-volkswagen-emissions-idUSKCN0RP14U20150928 (last visited on Sept. 28, 2015).

[11]     https://media.vw.com/release/1074/ (last visited on Sept. 25, 2015).

emissions systems. Defendants and/or their agents also tested the vehicles and falsely reported compliant levels of emissions to the EPA and CARB to fraudulently obtain certificates of conformity, and failed to come clean to regulators when they were confronted with discrepancies as described further below. Defendants and/or their agents also developed and disseminated VW's "clean" diesel advertising campaign, websites, owners' manuals and warranty booklets, advertisements, brochures, and other promotional materials that falsely or misleadingly touted the Defective Vehicles' low-emissions, fuel economy and performance.

27. Defendant Does 1-25 are other persons or entities involved in the design, manufacture, sale, distribution and marketing of the Defective Vehicles and/or the defeat device and/or other auxiliary emissions devices installed therein.

### COMMON FACTUAL ALLEGATIONS

(a) **Defendants' Illegal Scheme Is Hatched for VW's Diesel Engines**

28. Many may view diesel engines as a relic of the past, where vehicles would emit thick, toxic smoke full of dangerous and destructive pollutants. However, diesel technology has reportedly improved so significantly that it is now viewed as a "green" alternative to the standard gasoline automobile, oftentimes grouped with electric and hydrogen cell vehicles.[12]

29. Diesel vehicles use diesel fuel instead of standard gasoline, and ignite the fuel through a combination of high temperatures and high compression within the engine, as opposed to a spark ignition in the typical automobile engine. Diesel fuel is traditionally much denser than gasoline, and the high density fuel mixed with higher operating temperatures tends to produce a more efficient vehicle; gasoline engines are typically 30% efficient at converting fuel into energy, while diesel engines can convert well over 45% of fuel energy into useful mechanical energy.[13]

30. Diesel engines exist in a state of balance between rich and lean states. A diesel engine in a rich state contains more fuel than air, which tends to produce higher amounts of pollutant

---

[12] http://www.fool.com/investing/general/2015/02/22/clean-diesel-hydrogen-fuel-cell-or-electric-volksw.aspx (last visited on Sept. 28, 2015).

[13] http://www1.eere.energy.gov/vehiclesandfuels/pdfs/basics/jtb_diesel_engine.pdf (last visited on Sept. 28, 2015).

soot and reduced fuel efficiency. On the other hand, the lean state contains more air than fuel and produces higher amounts of $NO_X$.[14] Neither of these discharges are desirable, as soot is rich in hazardous hydrocarbons and dangerous to lungs and hearts, while $NO_X$ – which can travel hundreds of miles from the source of emission – has a particularly destructive effect on the ozone layer.

31.  In order for the EPA to designate a diesel automobile as a "clean" vehicle, it must produce both low soot and low $NO_X$. Since achieving that is a difficult feat, significant engineering and innovation is required to achieve a clean rating. Typically, this involves running the diesel engine in a highly compressed, lean state to maximize fuel efficiency, countering soot production with diesel particulate filters and controlling the $NO_X$.

32.  To reduce $NO_X$ emissions, diesel manufacturers were typically presented with two options: selective catalytic reduction, or use of a lean $NO_X$ trap. Selective catalytic reduction involves injecting urea into a diesel vehicle's exhaust stream to react with the $NO_X$, thereby turning it into harmless nitrogen and oxygen. This approach is quite effective, but it requires expensive, relatively bulky equipment to be added to the vehicle. Volkswagen sought to avoid this by using a lean $NO_X$ trap, which involved the storage of $NO_X$ in a separate compartment during vehicle operation. When the compartment is full, the system then burns off the stored $NO_X$ by pumping an extra burst of fuel into the cylinders, most of which passes through to the converter where it burns the $NO_X$ into harmless nitrogen and oxygen. This method is relatively cheaper and easier to implement than selective catalytic reduction, but results in lower fuel efficiency.

33.  Volkswagen purportedly optimized their engines carefully to maintain low emissions, while simultaneously enjoying the cost savings of a lean $NO_X$ trap system. They claimed to do this by monitoring and adjusting combustion conditions and using a two-stage exhaust gas recirculation system to reduce initial emissions, and then handling the remaining emissions using a lean $NO_X$ trap.[15]

---

[14]   $NO_X$ is a generic term for nitrogen oxides. They are produced from the reaction of nitrogen and oxygen gases in the air during combustion.

[15]   *See* Hadler et al., *Volkswagen's New 2.0l TDI Engine Fulfils the Most Stringent Emission Standards*, INTERNATIONALES WIENER MOTORENSYMPOSIUM 2008.

34.     This optimal balancing of diesel emissions is both difficult and expensive, and typically requires an additional investment of around $300 per car to achieve, using urea injectors.[16] But starting with its 2009 TDI models, Volkswagen claimed to have achieved this engineering feat to the satisfaction of the EPA without making this additional investment, all while wrapping it in a fun, affordable, high-performance package that seemed to offer the best of all worlds for consumers.

(b)     **Volkswagen's Dirty "Clean Diesel" Advertising Campaign and Its Far-reaching Consequences**

35.     The illegal scheme and common course of conduct described in this Complaint was fueled by Defendants' national advertising campaign around its "clean" diesel engines. Much of Volkswagen's success in the diesel market has been tied to its advertisement of its vehicles as eco-conscious vehicles. In fact, Volkswagen itself refers to the Defective Vehicles as "clean diesel vehicles" and was engaging in broad campaigns to "get clean-diesel power the recognition it deserves as a true 'green' technology."[17]

36.     Volkswagen wanted to drive home this "clean" and environmentally friendly concept so much that they included the term "Clean Diesel" in the name of the Defective Vehicles.

37.     Volkswagen was on a mission to change the way consumers thought of diesel and remove the mental image of sulfur emissions amid clouds of thick soot and instead tout the heightened efficiency and reduced $CO_2$ emissions. In fact, the Volkswagen website states: "This ain't your daddy's diesel. Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI Clean Diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel."[18]

38.     Through a national advertising campaign, Volkswagen touted that "Clean diesel delivers more torque, lower fuel consumption and reduces $CO_2$ emissions compared with equivalent

---

[16]  *See* http://consumerist.com/2015/10/05/why-did-volkswagen-only-rig-emissions-systems-on-diesel-cars/ (last visited on Oct. 16, 2015).

[17]  *See* http://media.vw.com/release/617 (last visited on Sept. 28, 2015).

[18]  https://www.vw.com/content/vwcom/es/features/clean-diesel.html (last visited on Sept. 21, 2015).

gasoline engines."[19]  In fact, this advertising even culminated in a Guinness World Record attempt, winning the award for "lowest fuel consumption – 48 U.S. states for a non-hybrid car" while driving a 2013 Volkswagen Passat TDI.[20]

39.    The following are examples of Volkswagen's advertising campaign touting the Defective Vehicles:



---

[19]  http://www.volkswagengroupamerica.com/clean_diesel_tdi.html (last visited on Sept. 21, 2015).

[20]  http://www.autotrader.com/car-news/volkswagen-passat-tdi-sets-world-record-for-fuel-economy-210689 (last visited on Sept. 28, 2015).

40. While secretly engaging in fraudulent conduct, evading regulators, and concealing from the public that the Defective Vehicles emitted up to 40 times the amount of pollution allowed under applicable law (or that was detected in smog testing), Volkswagen stated: "The Volkswagen Group is a leader in clean diesel technology" and "[w]ith the introduction of the new EA288 engine, we are excited that our family of TDI Clean Diesel vehicles is continuing to improve and will be even more clean, fuel efficient and powerful."[21]

41. One advertisement for the Audi A3 depicts Kermit the Frog saying "it's not that easy being green," where celebrity Joel McHale responds "[i]t is now" while referring to the Audi A3.[22]

42. This advertising campaign proved successful, as Volkswagen took a commanding lead in U.S. diesel sales and was even profiled in many environmental websites and blogs as a preferred vehicle choice, relying on Volkswagen's representations of high mileage and low diesel emissions.[23] In fact, many of the Defective Vehicles were deemed eligible for federal income tax credits to spur the sale of "clean diesel" technology, and at least $78 million was earmarked for the first run of diesel Jetta buyers in 2009 and 2010.[24]

43. However, while touting that it was committed to making eco-conscious vehicles and referring to its diesel vehicles as "Clean Diesel," Volkswagen concealed that the engine system contained a defect that intentionally allowed the Defective Vehicles to emit much more pollution than allowed by law or disclosed to the public.

44. This pollution is no trivial matter. Beyond the concerns of air quality and the environment, there is an immediate threat to public health and safety. In fact, some reports have estimated that the defeat devices "allowed VWs to spew enough pollution to cause somewhere

---

[21] http://media.vw.com/release/495 (last visited on Sept. 28, 2015).

[22] https://adsoftheworld.com/media/tv/audi_67th_primetime_emmy_awards _kermit _gets_set_up (last visited on Sept. 28, 2015).

[23] *See, e.g.*, http://www.mnn.com/green-tech/transportation/blogs/clean-diesel-what-you-need-to-know; http://www.greencarreports.com/news/1090957_2015-vw-golf-beetle-passat-jetta-all-get-new-clean-diesel-engine (last visited on Sept. 28, 2015).

[24] https://finance.yahoo.com/news/volkswagen-shares-plunge-most-six-071319964.html (last visited on Sept. 28, 2015).

between 16 and 94 deaths over seven years, with the annual count increasing more recently as more of the diesels were on the road. The total cost has been well over $100 million."[25]



## Calculating human toll of VW emissions problems

U.S. pollution resulting from Volkswagen's dodging of emissions tests is enough to have caused dozens of deaths since 2008. An AP analysis calculated upper and lower limits of pollution using the number of affected vehicles each year and average mileage. Scientists used that data in epidemiological computer models to estimate a range of deaths.

CUMULATIVE NUMBER OF AFFECTED VEHICLES IN THE U.S.

461,723 vehicles

YEARLY ESTIMATED RANGE OF U.S. DEATHS FROM VW EMISSIONS VIOLATIONS

2015: Max: 20

Min: 5

High and low estimates are based on total excess pollution from VW diesels, but there are variables that make the figures rough estimates.

AFFECTED VEHICLES, BY MODEL

8,802 — VW Beetle
13,656 — Audi A3
47,809 — VW Golf
105,754 — VW Passat
285,702 — VW Jetta

NOTE: The total of 47,809 for VW Golf includes 3,530 VW Golf Sportswagen vehicles. The total figure of 461,723 is derived from Kelley Blue Book vehicle registration data. The Environmental Protection Agency estimates the total number of affected vehicles in the U.S. to be about 482,000.

SOURCES: AP analysis of data from the U.S. Environmental Protection Agency and Kelley Blue Book; Professor Peter Adams, Carnegie Mellon; Volkswagen; Audi                    AP

45.     Nevertheless, even after the truth was revealed, Volkswagen had the audacity to maintain their webpage, which states that, among other things, "Our commitment to making vehicles that are eco-conscious is part of bigger thinking."[26]

---

[25]   http://www.businessinsider.com/ap-ap-analysis-vw-evasion-likely-led-to-dozens-of-deaths-2015-10 (last visited on Oct. 16, 2015).

46. This misleading advertising campaign was not limited to consumers, either. Volkswagen was also engaged in an aggressive lobbying campaign to the U.S. government to receive tax credits for the Defective Vehicles akin to those offered for electric cars.[27] This was met with some success: the IRS paid tens of millions (if not hundreds of millions) in improper tax credits for the Defective Vehicles.[28]

### (c) Volkswagen's Illegal Scheme to Obtain Fraudulent EPA Certificates of Conformity for Sale of the Defective Vehicles

47. The EPA administers a certification program to ensure that every vehicle introduced into U.S. commerce satisfies applicable emissions standards, and issues certificates of conformity to vehicles that satisfy the emissions standards for certain pollutants.

48. To obtain a certificate of conformity and thereby be allowed to introduce a vehicle into U.S. commerce, a vehicle manufacturer, such as Volkswagen, must submit an application to the EPA that includes a list of all auxiliary emission control devices installed on the vehicles, a justification for each, and a rationale for why the control device is not a defeat device.

49. A defeat device is defined as an auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation." 40 C.F.R. §86.1803-01. As made clear by federal regulations: "No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device." *Id.*, §86.1809-10. Thus, motor vehicles that contain a defeat device cannot be certified, or sold, in the United States.

---

[26] https://www.vw.com/content/vwcom/es/features/clean-diesel.html (last visited on Sept. 21, 2015).

[27] http://dailycaller.com/2015/10/13/volkswagen-lobbied-obama-administration-for-green-tax-credits/ (last visited on Oct. 16, 2015).

[28] http://www.forbes.com/sites/kellyphillipserb/2015/10/07/senate-investigates-volkswagen-dealings-with-irs-on-tax-credits/ (last visited on Oct. 16, 2015); *see also* http://www.law360.com/environmental/articles/714628?nl_pk=b1bf5f0b-4477-40d3-95dc-ea7e5b9e1e58&utm_source=newsletter&utm_medium=email&utm_campaign=environmental (reporting that Senators Schumer and Blumenthal have called for VW to return more than $200 million in fuel efficiency tax credits) (last visited on Oct. 16, 2015).

50. Volkswagen, however, installed defective Clean Diesel engine systems containing a defeat device in the Defective Vehicles, but did not disclose the presence of the defective engine system or defeat device to the EPA or to the consuming public, and instead intentionally and fraudulently misrepresented the amount of emissions released by the Defective Vehicles in normal vehicle operation. This enabled Volkswagen to circumvent EPA regulation and fraudulently pass EPA tests, and then, after the engine detected that the test was over, the engine would return to primary driving mode and its grossly excessive $NO_X$ emissions.

51. The certificates of conformity issued by the EPA for the Defective Vehicles state: "this certificate covers only those new motor vehicles or vehicle engines which conform, in all material respects, to the design specifications" described in the application for the certificate of conformity.

52. Thus, because the defective engine systems and defeat devices were not disclosed in Volkswagen's application to the EPA or to the consuming public, the Defective Vehicles are not covered by a valid certificate of conformity and are not legally permitted to be introduced into U.S. commerce. Volkswagen hid this fact from the EPA, from other government agencies, and from consumers, and has continued to sell and/or lease the Defective Vehicles to the public.

53. No one would have purchased or leased these vehicles had Defendants come clean about their defeat devices. That is because Defendants could not obtain a valid certificate of conformity but for their fraud in order to introduce the Defective Vehicles into U.S. commerce. And in fact, since Defendants have been found out, a stop-sale order was issued and the EPA has refused to certify the 2016 models for sale, starkly demonstrating that the sales and leases to Plaintiff and the Class never would have occurred but for Defendants' illegal and fraudulent scheme.

(d) **Volkswagen's Illegal Scheme Finally Comes to Light**

54. Defendants managed to evade the detection of regulators and the consuming public for years. It was not until September 18, 2015, that the EPA issued a Notice of Violation (the "Violation Notice"), stating that Volkswagen violated §203(a)(3)(B) of the Clean Air Act, 42 U.S.C. §7522(a)(3)(B) (the "CAA"), by manufacturing and installing "defeat devices" in certain model year

- 16 -

2009-2015 diesel light engine vehicles that bypass, defeat or render inoperative elements of the vehicles' emission control systems.

55. The Violation Notice noted that Congress's purpose in enacting the CAA was, *inter alia*, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare."[29] More specifically, "[t]he CAA and the regulations promulgated thereunder aim to protect human health and the environment by reducing emissions of nitrogen oxides (NOx) and other pollutants from mobile sources of air pollution."[30] The Violation Notice concluded that, in addition to violating the CAA, the Defective Vehicles also failed to conform to the vehicle specifications described by Volkswagen.

56. This was the first time that the public found out that, in an attempt to circumvent these laws, and gain profits from the sale and/or lease of the Defective Vehicles, Volkswagen had manufactured and installed the Defective Vehicles with defeat devices in the control module of the vehicles that sensed when the vehicles were being tested for compliance with EPA emissions standards. And that, during EPA emissions testing for the Defective Vehicles' certificates of compliance, the device sensed that it was being tested by tracking the parameters of the federal test procedure used for EPA emissions testing and then fraudulently produced compliant emission results.

57. This is also the first time that the public found out that, to the detriment of the environment and the consuming public, the emissions results for the Defective Vehicles were not accurate for normal vehicle operation, polluting at 10 to 40 times the legal limit,[31] and that the Defective Vehicles were "running an emissions setup that never should've left the factory."[32]

---

[29] http://www3.epa.gov/otaq/cert/documents/vw-nov-caa-09-18-15.pdf (last visited on Sept. 28, 2015).

[30] *Id.*

[31] www3.epa.gov/otaq/cert/violations.htm (Notice of Violation, Sept. 18, 2015) (last visited on Oct. 16, 2015).

[32] http://www.popularmechanics.com/cars/a17430/ezra-dyer-volkswagen-diesel-controversy/ (last visited on Sept. 28, 2015).

58.     The unraveling of Defendants' illegal scheme started in May 2014, approximately 5 years after the first model year containing the defective engine system (and defeat device) was introduced by Volkswagen.  In May 2014, West Virginia University's Center for Alternative Fuels, Engines & Emissions first published results of a study commissioned by the International Council on Clean Transportation, which found certain of the Defective Vehicles' real world $NO_x$ and other pollutant emissions exceeded the allowable EPA emissions standards.

59.     This study initially alerted the EPA and the California Air Resources Board ("CARB") to Volkswagen's emissions problems.

60.     However, despite the knowledge that the Defective Vehicles contained defective engine systems (and defeat devices intentionally designed to comply with emissions standards while under EPA testing but not under normal driving conditions), Volkswagen failed to disclose this fact to the EPA or the consuming public.

61.     Instead, Volkswagen continued to withhold this information and asserted that the increased emissions could be attributed to various technical issues and unexpected in-use conditions.

62.     In December 2014, Volkswagen issued a recall to update emission control software, and CARB (along with the EPA) conducted follow-up testing of the Defective Vehicles both in the laboratory and during normal road operation.  CARB attempted to pinpoint the exact technical nature of the Defective Vehicles' poor performance and determine why the vehicles' on-board diagnostic system was not detecting the increased emissions.  None of the potential technical issues suggested by Volkswagen adequately explained the higher test results confirmed by CARB.

63.     While offering fabricated solutions, Volkswagen continued to remain silent regarding its knowledge of the true source of the emissions discrepancies: Volkswagen's defective engine systems and defeat devices.

64.     In fact, German newspapers are reporting that Volkswagen's knowledge of the emissions discrepancies can be traced back for many years.  It has been reported that Volkswagen was first alerted to the defeat device altering emissions as early as 2007, when Bosch (a company that supplies electronics to the automotive industry) wrote a letter to Volkswagen warning them not to use the defeat device during regular operation.  Additionally, in 2011, a Volkswagen

whistleblower alerted Volkswagen about "illegal practices in connection with emissions levels."[33] Under the leadership of the defendants Winterkorn and Horn, Volkswagen chose to suppress and/or ignore these repeated warnings, and continued to deceive the EPA, CARB, and its customers.

65.     It is widely believed that Volkswagen began installing defeat devices to cheat emissions tests in 2008, after Volkswagen's head engineers realized that their newly developed "EA 189" diesel engines could not meet stringent emissions standards.  Rather than redesign the engines once more, at great expense, Volkswagen instead elected to install and widely market the Defective Vehicles and merely hope that the defeat devices could cover up their engineering shortfalls.[34] German newspapers have reported that this decision involved "'at least 30 people,'" with the number likely to grow.[35]

66.     It was only when CARB and the EPA threatened to withhold certificates of conformity for Volkswagen's 2016 model year vehicles until Volkswagen adequately explained the anomaly regarding the higher emissions that Volkswagen finally came clean.

67.     Only in the face of these regulatory ultimatums did Volkswagen admit that it had designed and installed defective engine systems that allowed the Defective Vehicles to operate out of compliance with emission regulations in normal operation, but contained a device which detected when a vehicle was undergoing emissions testing and only operated in compliance with emissions standards during such testing.

68.     The defective engine system and defeat device hidden from the EPA and consumers was designed by Volkswagen for the express purpose of tracking the parameters of the federal test procedure and causing emission control systems to underperform when the device determined that the vehicle was not undergoing an emissions test procedure.

---

[33]     http://www.latimes.com/business/la-fi-volkswagen-warned-20150927-story.html (last visited on Sept. 28, 2015).

[34]     http://www.nytimes.com/2015/10/05/business/engine-shortfall-pushed-volkswagen-to-evade-emissions-testing.html (last visited on Oct. 16, 2015).

[35]     http://fortune.com/2015/10/14/dozens-of-managers-implicated-in-volkswagen-scandal/  (last visited on Oct. 16, 2015).

69. Volkswagen has now admitted that each of the Defective Vehicles contains an illegal defeat device and does not conform to the specifications provided by Volkswagen. The engine systems are defective and do not operate in accordance with federal and state law, and do not operate as represented by Volkswagen. Further, the engine systems in 2016 diesel vehicles also contain an "'auxiliary emissions control device,'" which Volkswagen claims to be different from their defeat device, but its full effects and details remain unconfirmed.[36]

70. The EPA investigation is ongoing and may lead to a finding of additional violations, defeat devices, and affected Defective Vehicles. Further, California and dozens of state attorneys general are conducting simultaneous investigations that may likewise uncover additional fraud.[37]

(e)     **The Fallout from the Revelation of Volkswagen's Fraudulent Scheme**

71. Immediately after the revelation of Volkswagen's fraud, Volkswagen attempted to scrub their clean diesel advertisements from the internet, as those advertisements served to highlight Volkswagen's fraud, such as holding white towels to Defective Vehicle exhaust pipes to highlight the lack of "dirty" emissions.[38]

72. In a carefully crafted public statement issued after the fraud was revealed, defendant Winterkorn did not accept responsibility, but instead stated that he was "deeply sorry that we have broken the trust of our customers and the public."[39] Later, amidst global scrutiny, on September 23, 2015, Winterkorn announced his resignation from VW AG.[40] However, he retained his position as the head of Porsche Automobil Holding SE, a holding company that owns greater than 50 percent of

---

[36]   http://bigstory.ap.org/urn:publicid:ap.org:5c7a66fe0bd448f999b2c59379622488 (last visited on Oct. 16, 2015).

[37]   http://web.archive.org/web/20151003163135/http://abcnews.go.com/US/wireStory/ california-conduct-volkswagen-investigation-34189802 (last visited on Oct. 16, 2015).

[38]   http://jalopnik.com/why-did-volkswagen-delete-all-of-its-diesel-ads-from-yo-1731691453 (last visited on Sept. 28, 2015).

[39]   http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/state ment_ceo_of_volkswagen_ag.html (last visited on Sept. 28, 2015).

[40]   http://www.nytimes.com/2015/09/24/business/international/volkswagen-chief-martin-winterkorn-resigns-amid-emissions-scandal.html?_r=0 (last visited on Sept. 28, 2015).

VW AG's voting shares.[41] His resignation from that position was later announced on October 17, 2015, and scheduled to take effect October 31, 2015; a move regarded by Ferdinand Dudenhoeffer, director of the Center for Automotive Research at the University of Duisburg-Essen as "a good sign but it comes very late."[42]

73. Soon after Winterkorn's public statement, defendant Horn added: "Let's be clear about this: Our company was dishonest with the EPA and the California Air Resources Board and with all of you. In my German words, we have totally screwed up."[43] Though Horn evaded the same fate as Winterkorn, as he has not yet been fired or compelled to resign, Horn has testified before Congress's Energy and Commerce Committee, as well as the EPA.[44]

74. Volkswagen has since released a stop-sale order instructing dealers to immediately stop selling the Defective Vehicles.[45] Volkswagen has also withdrawn its application to the EPA for approval to sell its model year 2016 diesel vehicles, leaving them quarantined in ports until Volkswagen resolves the presence of auxiliary emissions control devices to the satisfaction of the EPA.[46]

---

[41] http://www.cnbc.com/2015/10/17/winterkorn-to-leave-porsche-in-aftermath-of-emissions-rigging-scandal.html (last visited Oct. 19, 2015).

[42] http://www.bloomberg.com/news/articles/2015-10-17/vw-ex-ceo-winterkorn-quits-porsche-post-after-emissions-scandal (last visited Oct. 19, 2015).

[43] http://www.washingtonpost.com/business/economy/vw-emissions-cheating-affects-11-million-cars-worldwide/2015/09/22/30f59bca-6126-11e5-9757-e49273f05f65_story.html?fhakfjksajflkajs (last visited on Sept. 28, 2015).

[44] http://autoweek.com/article/car-news/congress-compels-vw-us-ceo-michael-horn-testify-diesel-crisis (last visited on Oct. 16, 2015).

[45] http://www.detroitnews.com/story/business/autos/foreign/2015/09/19/vw-us-dealers-halt-sales-diesel-cars/72488232/ (last visited on Oct. 16, 2015).

[46] http://bigstory.ap.org/urn:publicid:ap.org:5c7a66fe0bd448f999b2c59379622488 (last visited on Oct. 16, 2015).

75.     Experts now point to the "uniquely awful" corporate governance at Volkswagen as a major factor in their fraudulent scheme.[47] Volkswagen's "peculiar corporate culture" and "lax boardroom controls," combined with highly centralized decision-making and a culture that encouraged the concealment of problems, greatly increased the risk of corporate fraud and abuse.[48] Alexander Juschus, director of German proxy advisor IVOX, noted that "[t]here have been warnings about VW's corporate governance for years [including prostitution and bribery scandals in 2006], but they didn't take it to heart and now you see the result."[49]

76.     To remedy Volkswagen's violations, Volkswagen says that it intends to recall the Defective Vehicles and configure them to settings that produce a clean level of soot and $NO_X$.  In reconfiguring to this new setting, the efficiency, power, and performance of the Defective Vehicles will decline dramatically.  Further, there will be serious degradation of vehicle durability, as these vehicles are designed to operate under particular settings.  Certain parameters such as exhaust gas temperature, oil life, or engine/turbocharger RPMs will change and result in decreased durability as Volkswagen attempts to undo the effects of their fraud.  The new Volkswagen CEO, Matthias Mueller, has stated that Volkswagen expects their recalls of Defective Vehicles to begin in January 2016, and that the recall process will take up to a year to complete.[50]

77.     As speculated by Karl Brauer, senior analyst for Kelley Blue Book: "'It's really unknown, but I think there'll be an extended period of reduced value for [used Volkswagen vehicles].  The resolution will probably not leave as big of an impression and won't counteract the initial impression that [consumers] are getting with these diesel cars.'"[51]

---

[47]    http://www.cnbc.com/2015/10/04/volkswagens-uniquely-awful-governance-at-fault-in-emissions-scandal.html (last visited on Oct. 16, 2015).

[48]    *Id.*

[49]    *Id.*

[50]    *See* http://www.bbc.com/news/business-34455328 (last visited on Oct. 16, 2015).

[51]    http://www.cnbc.com/2015/09/24/as-volkswagen-loses-other-automakers-could-benefit.html (last visited on Sept. 28, 2015).

78.     Though the scope of, and timeframe for, Volkswagen's recall of the Defective Vehicles is presently ambiguous, Horn has reiterated that the recall would not begin until 2016, and would take at least a year or more to fully implement.[52]  Defendants have also said that they do not intend to buy back the cars.

79.     Unfortunately for affected consumers, like Plaintiff and the Class, one of the fundamental problems with the Defective Vehicles is that they promised high performance, environmentally friendly operation, and efficient fuel usage in a fun-to-drive vehicle.  Plaintiff and the Class bought or leased the Defective Vehicles based on these claims, and paid a premium for a diesel vehicle that had all of these traits.  That car may exist, but it was not the car Plaintiff and the Class were defrauded into purchasing or leasing.  Defendants should be required to buy back these cars.

(f)     **Volkswagen's Fraudulent Scheme Has Triggered Global Scrutiny**

80.     According to media reports, the DOJ has launched a criminal investigation into Volkswagen over the emissions cheating scandal.[53]  Additionally, the U.S. Senate has investigated Volkswagen's dealings with the IRS in obtaining green energy tax credits,[54] the U.S. Congress's Energy and Commerce committee has called upon Horn to testify to his knowledge of the scheme,[55] 45 state attorneys general have initiated investigations,[56] and the Federal Trade Commission has opened an investigation into Volkswagen's fraudulent advertising.[57]  As opined by National

---

[52]  http://arstechnica.com/cars/2015/10/volkswagen-to-begin-diesel-vehicle-recall-in-january-should-be-complete-by-end-of-2016/ (last visited on Oct. 16, 2015).

[53]  http://www.wsj.com/articles/u-s-justice-department-conducts-criminal-probe-of-volkswagen-sources-say-1442869059 (last visited on Oct. 16, 2015).

[54]  http://www.forbes.com/sites/kellyphillipserb/2015/10/07/senate-investigates-volkswagen-dealings-with-irs-on-tax-credits/ (last visited on Oct. 16, 2015).

[55]  http://www.cnbc.com/2015/10/08/vw-us-ceo-i-had-no-knowledge-in-2014-of-defeat-devices-on-vehicles.html (last visited on Oct. 16, 2015).

[56]  http://www.bloomberg.com/news/articles/2015-10-08/texas-sues-volkswagen-claiming-deception-emissions-violations-ifiqscqq (last visited on Oct. 16, 2015).

[57]  http://consumerist.com/2015/10/15/federal-trade-commission-opens-probe-into-volkswagens-clean-diesel-advertising/ (last visited on Oct. 16, 2015).

Highway Traffic Safety Administration Administrator Mark Rosekind, because of Volkswagen's fraud, "'[w]e're questioning everything now.'"[58]

81.     The German government is also reportedly investigating Winterkorn for criminal fraud, while several other countries in Europe and Asia are likewise investigating both Winterkorn and VW.[59] Preliminary reports from internal investigations have indicated that, after becoming CEO of Volkswagen, Winterkorn personally appointed the head engineers that were directly involved in the decision to implement the defeat devices.[60]

82.     As part of their investigation into Volkswagen's conduct, German prosecutors have raided VW AG's Wolfsburg headquarters.[61]

83.     On October 15, 2015, VW AG reportedly announced that "Germany's automotive regulator has rejected the company's remediation plan for diesel vehicles equipped with software designed to cheat emissions tests, and has instead instructed the automaker to initiate a recall covering about 8.5 million vehicles across the European Union."[62]

84.     Further, the scale and brazenness of the fraud prompted Volkswagen to set aside a €6.5 billion fund to address affected consumers and the EPA.[63]

---

[58]   http://www.detroitnews.com/story/business/autos/foreign/2015/09/22/nhtsa-head-vw-diesel-deception-another-reason-question-assumptions/72614662/ (last visited on Oct. 16, 2015).

[59]   http://www.reuters.com/article/2015/09/28/us-volkswagen-emissions-idUSKCN0RP14U20150928           (last      visited       on      Oct.      16,      2015); http://www.bloomberg.com/news/articles/2015-09-30/diesel-scandal-undercuts-one-of-vw-s-few-strengths-in-showroom (last visited on Oct. 16, 2015).

[60]   http://www.wsj.com/articles/vw-emissions-probe-zeroes-in-on-two-engineers-1444011602 (last visited on Oct. 16, 2015).

[61]   http://www.bbc.com/news/business-34475408 (last visited on Oct. 16, 2015).

[62]   http://www.law360.com/environmental/articles/714628?nl_pk=b1bf5f0b-4477-40d3-95dc-ea7e5b9e1e58&utm_source=newsletter&utm_medium=email&utm_campaign=environmental (last visited on Oct. 16, 2015).

[63]   http://www.bloomberg.com/news/articles/2015-09-22/volkswagen-ceo-s-history-of-sweating-the-details-now-haunts-him (last visited on Oct. 16, 2015).

85.     In total, Defendants' illegal scheme deceived the public into buying approximately 500,000 Defective Vehicles at a total cost of billions of dollars to consumers nationwide, not even considering the cost of the harm already caused to the environment and public health, or the ongoing and immediate threat to the same.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated as members of the Classes listed below:

(a)     **The Nationwide Class:** All persons or entities in the United States who are current or former owners/lessees of a "Defective Vehicle." Defective Vehicles include: 2010-2015 Audi A3; 2012-2015 Volkswagen Beetle TDI and Volkswagen Beetle Convertible TDI; 2010-2015 Volkswagen Golf TDI; 2015 Volkswagen Golf SportWagen TDI; 2009-2015 Volkswagen Jetta TDI; 2009-2015 Volkswagen Jetta SportWagen TDI; and 2012-2015 Volkswagen Passat TDI. The Nationwide Class claims include Plaintiff's RICO claim and Tennessee claims because the misconduct emanated, in part, from this State by and through the manufacturing center in Chattanooga.

(b)     **The Tennessee Class:** All persons or entities in the state of Tennessee who are current or former owners/lessees of a "Defective Vehicle." Defective Vehicles include: 2010-2015 Audi A3; 2012-2015 Volkswagen Beetle TDI and Volkswagen Beetle Convertible TDI; 2010-2015 Volkswagen Golf TDI; 2015 Volkswagen Golf SportWagen TDI; 2009-2015 Volkswagen Jetta TDI; 2009-2015 Volkswagen Jetta SportWagen TDI; and 2012-2015 Volkswagen Passat TDI.

87.     Specifically excluded from the proposed Class are individuals who have personal injury claims resulting from the Defective Vehicles, Volkswagen, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, and joint ventures, or entities controlled by Volkswagen, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Volkswagen and/or its officers and/or directors, or any of them, any judge assigned to this action, and any member of their immediate family.

88.     Subject to additional information obtained through further investigation and discovery, the foregoing Class definition may be expanded or narrowed by amendment or superseded by Plaintiff's motion for class certification. Plaintiff expressly reserves the right to move for class certification of different state classes and different or additional vehicles.

89.     **Numerosity of the Class**. The members of the Class are so numerous that their individual joinder is impracticable. Upon information and belief, Volkswagen sold approximately 500,000 Defective Vehicles. Plaintiff is informed and believes that there are thousands of members in the Class. Inasmuch as the Class members may be identified through business records regularly maintained by Volkswagen and its employees and agents, and through the media, the number and identities of Class members can be ascertained. Members of the Class can be notified of the pending action by e-mail and mail and supplemented by published notice, if necessary.

90.     **Existence and Predominance of Common Question of Fact and Law**. There are questions of law and fact common to the Class. These questions predominate over any questions affecting only individual Class members. These common legal and factual issues include, but are not limited to:

        (a)     whether Volkswagen engaged in the conduct alleged herein;

        (b)     whether the Defective Vehicles contain a defective engine system that does not comply with EPA emission standards;

        (c)     whether Volkswagen illegally imported the Vehicles;

        (d)     whether Volkswagen violated the RICO statute;

        (e)     whether Volkswagen violated Tennessee state law;

        (f)     whether Volkswagen violated the MMWA;

        (g)     whether Volkswagen breached its warranties;

        (h)     whether Volkswagen violated the common law;

        (i)     whether the Defective Vehicles emit more pollution than represented by Volkswagen;

        (j)     whether the Defective Vehicles emit more pollution than allowed under applicable state and federal law;

- 26 -

(k)     whether the Defective Vehicles can be made to comply with EPA emission standards without sacrificing fuel efficiency or performance;

(l)     whether the Defective Vehicles can be made to comply with representations made by Volkswagen;

(m)     whether Volkswagen's representations regarding the Defective Vehicles were materially misleading;

(n)     whether Volkswagen knew of the defective engine system and defeat device in the Defective Vehicles, and if so, how long has Volkswagen had this knowledge;

(o)     whether Volkswagen intentionally designed, manufactured, and installed defective engine systems in the Defective Vehicles;

(p)     whether Plaintiff and other Class members overpaid for the Defective Vehicles;

(q)     whether Volkswagen's conduct violates the laws as set forth in the causes of action;

(r)     whether Volkswagen's inevitable remedial measures reduce the utility, value, or performance of their Defective Vehicles;

(s)     whether Plaintiff and Class members are entitled to equitable or injunctive relief; and

(t)     whether Plaintiff and Class members are entitled to restitution or damages, and what is the proper measure of these damages.

91.     **Typicality**.  The claims of the representative Plaintiff are typical of the claims of each member of the Class.  Plaintiff, like all other Class members, has sustained damages arising from Volkswagen's violations of the laws, as alleged herein.  The representative Plaintiff and Class members were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Volkswagen.

92.     **Adequacy**.  The representative Plaintiff will fairly and adequately represent and protect the interests of the Class members and has retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation.  There are no material

- 27 -

conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of all Class members.

93. **Predominance and Superiority**. This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual Class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Volkswagen's conduct. Further, it would be virtually impossible for Class members to individually redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

94. Plaintiff contemplates the eventual issuance of a notice to the proposed Class members setting forth the subject and nature of the instant action. Upon information and belief, Volkswagen's own business records and electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff would contemplate the use of additional media and/or mailings.

95. Additionally, this action is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

(a) without class certification and determination of declaratory, injunctive, statutory, and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

(i)  inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

(ii)  adjudication with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudication or substantially impair or impede their ability to protect their interests;

(b)  the parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole; or

(c)  common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy, including consideration of:

(i)  the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

(ii)  the extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

(iii)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(iv)  the difficulties likely to be encountered in the management of a class action.

96.  Damages may be calculated from the data maintained in Defendants' records, so that the cost of administering a recovery for the Class can be minimized. However, the precise amount of damages available to Plaintiff and Class members is not a barrier to class certification.

## TOLLING OF THE STATUTE OF LIMITATIONS

(a)  Discovery Rule Tolling

97.  Plaintiff and the members of the Class could not have discovered through the exercise of reasonable diligence that Volkswagen was concealing and misrepresenting the Defective

Vehicles' emission specifications and that the Defective Vehicles contained a defeat device rendering the Clean Diesel engine system defective in violation of federal and state laws within the time period of any applicable statutes of limitation.

98. Plaintiff and the other Class members did not know, and could not reasonably discover, that Volkswagen intentionally failed to report information within its knowledge to federal and state authorities, or consumers.

99. Likewise, a reasonable and diligent investigation could not have disclosed that Volkswagen intentionally engaged in emissions deception and that it concealed that information, which was discovered by Plaintiff shortly before this action was filed.

100. For years, Volkswagen concealed the defeat device contained in the Defective Vehicles and maintained that the increased emissions from these vehicles could be attributed to various technical issues and unexpected in-use conditions.

101. Only on or about September 3, 2015, when the EPA and CARB stated that they would not approve Volkswagen's 2016 model year diesel vehicles until Volkswagen could adequately explain the anomalous emissions, did Volkswagen admit that Defective Vehicles contained defective clean diesel engine systems. The allegations in this Complaint became known only in the wake of this announcement.

102. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to Defective Vehicles.

(b) Fraudulent Concealment Tolling

103. Throughout the time period relevant to this action, Volkswagen concealed from Plaintiff and the other Class members the defects described herein. Thus, all applicable statutes of limitation have also been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

104. Instead of disclosing its emissions scheme, or that the Clean Diesel engine systems contained in the cars were defective and resulted in emissions from the Defective Vehicles that were far worse than represented and violated federal and state law, Volkswagen falsely represented the

Defective Vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

105. Volkswagen intentionally designed and installed the defeat device to conceal the true amount of pollutants emitted by the Defective Vehicles, and withheld this information for many years. Only when the EPA and CARB withheld approval of Volkswagen's 2016 model year diesel vehicles until Volkswagen could adequately explain the anomalous emissions did Volkswagen admit that Defective Vehicles contained defective clean diesel engine systems that emitted far more pollutants than permitted under EPA standards and disclosed to the public.

106. Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiff and the other Class members have incurred by virtue of the fraudulent concealment doctrine.

(c)     Estoppel

107. Volkswagen was under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the Defective Vehicles, including facts that it knew about the Defective Vehicles' clean diesel engine systems and pollutant emissions and the Defective Vehicles' failure to comply with federal and state law.

108. Volkswagen knowingly, affirmatively, and actively concealed the true nature, quality, and character of the clean diesel engine systems, the emissions control systems, and the emissions of the Defective Vehicles.

109. Although Volkswagen had the duty to disclose to Plaintiff and Class members that it had engaged in the deception described herein and installed defective clean diesel engine systems in the Defective Vehicles, Volkswagen chose to evade federal and state emissions standards and intentionally misrepresented its lack of compliance with federal and state law.

110. Thus, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

# COUNT I

## VIOLATIONS OF THE RACKETEER INFLUENCED
## & CORRUPT ORGANIZATIONS ACT

### (18 U.S.C. §1962(c)-(d))
### (On Behalf of Plaintiff Against Defendants VW AG,
### Winterkorn, and Horn)

111.    Plaintiff incorporates all allegations made herein.

112.    This Count is brought against defendants VW AG, Winterkorn and Horn on behalf of the Nationwide Class. VW America is not a defendant for purpose of this RICO claim.

113.    This claim arises under 18 U.S.C. §1962(c) and (d), which provides in relevant part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

114.    Defendants engaged in a fraudulent scheme, common course of conduct and conspiracy to increase market share and revenues and to minimize losses for Defendants and their co-conspirators from the design, manufacture, distribution and sale of the Defective Vehicles.

115.    To achieve these goals, Defendants entered into agreements to sell the Defective Vehicles to the public, obtained fraudulent certificates of conformity from the EPA, and disseminated false and misleading advertising and marketing materials to sell such vehicles without disclosing that they were illegal and defective.  As a direct result of their conspiracy and fraudulent scheme, Defendants were able to extract revenues of billions of dollars from Plaintiff and the Class.

116.    Volkswagen is the largest automaker in the world by sales, and conducts its business – legitimate and illegitimate – through various affiliates and subsidiaries, each of which is a separate legal entity.  At all relevant times, defendants VW AG, Winterkorn, and Horn were "person[s]," as defined in 18 U.S.C. §1961(3), because they were "capable of holding a legal or beneficial interest in property."

117.    In an effort to expand its global reach, market share, and standardization of vehicle marketing and sales in the United States, VW AG, a publicly traded German company, formed VW

America, a separate New Jersey company that is headquartered in Virginia. VW America is not publicly traded and has no SEC reporting obligations, but it does have reporting obligations, protections and responsibilities unique to the State of New Jersey. At all relevant times, defendants Winterkorn and VW AG had hiring and firing authority over the executive officers of VW America, as well as oversight of VW America's operations, and tight control over the design, manufacture, and testing of the Defective Vehicles. Defendant Horn also exercised control over VW America and its business and affairs during the relevant time period. At all times, VW America acted for or on behalf of VW AG and Defendants in undertaking the acts and/or omissions alleged herein.

118. VW America constitutes a RICO "enterprise" within the meaning of 18 U.S.C. §1961(4), through which VW AG and the individual defendants conducted the pattern of racketeering activity as described herein. VW AG directed VW America to engage in fraudulent activities that affected interstate commerce, which included obtaining fraudulent certificates of conformity from the EPA and the design, manufacture, testing, sale and distribution of the Defective Vehicles to consumers all over the United States. VW AG used VW America to manufacture and sell the Defective Vehicles throughout the United States with defeat devices that purposely circumvented federal and state laws, and VW America operated its largest emissions testing center in California and manufacturing plant in Chattanooga. VW America's separate legal status also facilitated the unlawful scheme and provided a hoped-for shield from liability for VW AG and the individual defendants and their co-conspirators.

119. Alternatively, VW AG, VW America, Winterkorn and Horn, and other individuals and entities, including third parties such as Bosch (the defeat device supplier) and others involved in the design, manufacture, testing, and sale of the Defective Vehicles, operated an association-in-fact enterprise, which was formed for the purpose of obtaining fraudulent certificates of conformity from the EPA and manufacturing, selling, importing and distributing the Defective Vehicles, and through which they conducted a pattern of racketeering activity, under 18 U.S.C. §1961(4). The enterprises alleged in this and the previous paragraph are referred to collectively as the "Illegal Defeat Device Enterprise."

120.    The Illegal Defeat Device Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as individuals and other entities associated-in-fact for the common purpose of engaging in Defendants' profit-making scheme.

121.    Defendants are employed by, and/or associated with, the Illegal Defeat Device Enterprise.

122.    Defendants directed the affairs of the Illegal Defeat Device Enterprise through, among other things, using their executive officers and engineers to direct critical aspects of the enterprise's operations, including the following:

(a)     VW AG formed VW America to carry out its scheme to increase market share and sales of vehicles through its false or misleading advertising campaign of VW's dirty diesel vehicles as clean;

(b)     Winterkorn tightly controlled all aspects of the operations of VW and its subsidiaries, including the design, marketing, sales, research and development of the supposed "clean" diesel engines; and

(c)     Horn had oversight and control over all aspects of VW America's operations, including the marketing, testing, compliance, and sales of the Defective Vehicles with the defeat devices.

123.    The Illegal Defeat Device Enterprise is an ongoing and continuing organization consisting of legal entities, including VW AG, VW America, their subsidiaries and network of dealerships, as well as third-party entities and individuals associated for the common or shared purpose of design, manufacture, distribution, testing, and sale of the Defective Vehicles to Plaintiff and the Class through fraudulent certificates of compliance, deceptive and misleading sales tactics or materials, and deriving profits and revenues from those activities.

124.    The Illegal Defeat Device Enterprise functions by selling vehicles to the consuming public.  Many of these products are legitimate, including vehicles that do not contain defeat devices. However, Defendants, through the Illegal Defeat Device Enterprise, have engaged in a pattern of racketeering activity which also involves a fraudulent scheme to increase revenue for Defendants

- 34 -

and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme.

125.     The Illegal Defeat Device Enterprise engages in and affects interstate commerce because it involves commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale of the Defective Vehicles throughout the country, and the receipt of monies from the sale of the same.

126.     Within the Illegal Defeat Device Enterprise there was a common communication network by which co-conspirators shared information on a regular basis. The Illegal Defeat Device Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Defective Vehicles to the general public nationwide.

127.     Defendants participated in the operation and management of the Illegal Defeat Device Enterprise by directing its affairs, as described herein. While Defendants participated in, and are members of, the Enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

128.     Each participant in the Illegal Defeat Device Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Illegal Defeat Device Enterprise, Defendants functioned as a continuing unit with the purpose of assisting with and furthering the illegal scheme and their common purpose.

129.     Defendants and the other members of the Illegal Defeat Device Enterprise all had the common purpose to maximize revenues and increase their market share and minimize losses by advertising and selling the Defective Vehicles as "clean" diesel vehicles with superior fuel efficiency and performance, which they knew or recklessly disregarded as defective and designed illegally to circumvent laws in this country.

130.     The Illegal Defeat Device Enterprise engaged in, and its activities affected, interstate and foreign commerce by designing, manufacturing, marketing, testing, and selling the Defective Vehicles to hundreds of thousands of persons in the United States.

131.     Defendants exerted substantial control over the Illegal Defeat Device Enterprise and participated in the conduct of the enterprise's affairs by:

(a)     designing the Defective Vehicles with cheat software and auxiliary devices;

(b)     failing to correct or disable the defeat devices when warned;

(c)     manufacturing Defective Vehicles that emitted greater pollution than the legal limit;

(d)     introducing the Defective Vehicles into the stream of United States commerce without a valid EPA certificate of conformity because the applications for such certificates were fraudulent;

(e)     persisting in the manufacturing, distribution, and sale of the Defective Vehicles even after questions were raised about the emissions testing;

(f)     misleading the government as to the nature of the defect;

(g)     misleading the driving public as to the nature of the defect;

(h)     designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

(i)     otherwise misrepresenting or concealing the defective nature of the Defective Vehicles from the public and regulators;

(j)     illegally selling the Defective Vehicles; and

(k)     collecting revenues and profits from the sale of such products.

132.     Defendants knew of the ongoing scheme, were willing participants in it, and made money from it.

133.     Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because all such information lies in Defendants' and others' hands.

134.     Defendants, each of whom is a person associated-in-fact with the Illegal Defeat Device Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c).    Defendants have committed, or aided and abetted in the

commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1341 and 1343), within the past ten years. The multiple acts of racketeering activity which they committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the Illegal Defeat Device Enterprise.

135.    In devising and executing the illegal scheme, Defendants devised and knowingly carried out a material scheme or artifice to defraud Plaintiff and the Class or to obtain money from Plaintiff and the Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

136.    Defendants' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

(a)    **Mail Fraud**: Defendants violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Defective Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

(b)    **Wire Fraud**: Defendants violated 18 U.S.C. §1343, by transmitting and receiving, or causing to be transmitted or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

137.    Defendants used (or caused to be used), thousands of interstate mail and wire communications in the execution of the scheme through virtually uniform misrepresentations, concealments and material omissions. Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

(a)    the Defective Vehicles themselves;

(b)     components for the cheat software;

(c)     essential hardware for the Defective Vehicles;

(d)     falsified emissions tests;

(e)     fraudulent applications for EPA certificates of conformity;

(f)     vehicle registrations and plates due to cheat device and fraudulently-obtained EPA certificates of conformity;

(g)     documents and communications that facilitated the falsified emissions tests;

(h)     false or misleading communications intended to lull the public and regulators from discovering the cheat software and/or auxiliary devices;

(i)     sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Defective Vehicles;

(j)     documents intended to facilitate the manufacture and sale of the Defective Vehicles, including bills of lading, shipping records, reports and correspondence;

(k)     documents to process and receive payment for the Defective Vehicles by unsuspecting consumers, including invoices and receipts;

(l)     deposits of proceeds; and

(m)     other documents and things, including electronic communications.

138.     Based on information and belief, defendants VW AG, Winterkorn, and Horn (or their agents), for the purpose of executing the illegal scheme, sent or received (or caused to be sent or received) by mail or by private or interstate carrier, shipments of the Defective Vehicles and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| **From** | **To** | **Date** | **Description** |
|---|---|---|---|
| Tennessee DMV | Jerel Rogers | August – September, 2015 | Mailed Registration for 2013 Passat TDI SE based on false EPA certificate of conformity due to defeat device. |

| From | To | Date | Description |
|---|---|---|---|
| Volkswagen Group of America, Inc. | Jerel Rogers | July 2014 | Mailed warranty letter for 2013 Passat TDI SE. |
| Volkswagen Group of America, Inc. | Jerel Rogers | January 2015 | Mailed warranty letter for 2013 Passat TDI SE. |

139. Volkswagen also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, VW America, under the direction and control of VW AG, made representations about the Defective Vehicles on its website, YouTube, and through ads and reviews online, all of which were intended to mislead the public about the fuel-efficiency, emissions standards, and other performance metrics.

140. Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

141. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme to deceive regulators and consumers and lure consumers into purchasing Defective Vehicles, which Volkswagen knew or recklessly disregarded as emitting greater pollution than advertised. These acts of mail and wire fraud were not committed in isolation; they were related and posed a threat of continued fraudulent activity.

142. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud would have occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

143. Defendants and other members of the Illegal Defeat Device Enterprise have obtained money and property belonging to Plaintiff and the Class as a result of these violations. Plaintiff and other Class members have been injured in their business or property by Defendants' overt acts of mail and/or wire fraud, and by their aiding and abetting others' acts of mail and wire fraud. . In fact,

they never would have purchased the Defective Vehicles but for Defendants' illegal scheme and common course of conduct.

144.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c), as described herein.  Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for Defendants and their unnamed co-conspirators throughout the illegal scheme.

145.    Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§1341 and 1343 offenses.

146.    Defendants engaged in a conspiracy to: (a) increase or maintain revenues; (b) increase market share; and (c) minimize losses of revenues or profits for Defendants and their co-conspirators.

147.    To achieve these goals, Defendants hid from the general public the unlawfulness and emissions dangers of the Defective Vehicles and obfuscated the true nature of the defect even after regulators raised concerns.  Defendants suppressed and/or ignored warnings from third-parties, whistleblowers, and governmental entities of both the unlawfulness of the defeat device and of the defects present in the Defective Vehicles.

148.    Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and selling the Defective Vehicles.

149.    Indeed, for the conspiracy to succeed, each of the Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics against their intended targets.

150.    Plaintiff and the Class have been injured in their property by the violations of 18 U.S.C. §§1962(c) and 1962(d), including the purchase price of the Defective Vehicles, the loss of

value of their vehicles, greater fuel costs, and other related expenses. In the absence of the unlawful scheme, Plaintiff and the Class would not have incurred these economic losses. Indeed, no one would have purchased or leased a Defective Vehicle because Defendants could not obtain a valid EPA certificate of conformity without the defeat device.

151. Plaintiff's and the Class's injuries were directly and proximately caused by Defendants' racketeering activities.

152. Defendants knew and intended that Plaintiff and the Class would rely on their misrepresentations and omissions about the Defective Vehicles. Defendants knew and intended that consumers would incur costs as a result. As fully alleged herein, Plaintiff, along with thousands of other consumers, relied upon Defendants' representations and omissions. Their reliance is made obvious by the fact that they purchased an illegal vehicle that never should have been introduced into the stream of commerce in the United States and whose worth has now plummeted and has no "fix" in sight. In addition, the EPA and regulators also relied on Defendants' statements; otherwise Defendants could not have obtained a valid certificate of conformity to sell vehicles.

153. Because of Defendants' illegal scheme, common course of conduct, and conspiracy, Plaintiff and the Class purchased vehicles that are now greatly depreciated in value. The damages suffered by Plaintiff and the Class may be measured by the total amount paid for the vehicles, which totals billions of dollars nationwide, even without trebling their damages.

154. Under 18 U.S.C. §1964(c), Plaintiff is entitled to recover treble his actual damages plus interest, the costs of bringing this suit, and reasonable attorneys' fees.

## COUNT II

## FRAUD BY CONCEALMENT

### (On Behalf of Plaintiff Against All Defendants)

155. Plaintiff incorporates all allegations made herein.

156. This claim is brought on behalf of the Nationwide Class, or alternatively, the Tennessee Class.

157. Volkswagen intentionally concealed and suppressed material facts concerning the quality and character of the Defective Vehicles. As alleged herein, Volkswagen engaged in

deception to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions.

158. The software installed on the vehicles at issue was designed to only activate during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was that the Defective Vehicles improperly passed emissions certifications by way of deliberately induced false readings.

159. Plaintiff and Class members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiff and Class members did not, and could not, discover Volkswagen's deception on their own.

160. Volkswagen's false representations were material to consumers because they concerned the quality of the Defective Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because of the price premium charged for the Defective Vehicles.

161. Volkswagen had a duty to disclose the emissions deception in which it engaged with respect to the Defective Vehicles because knowledge of the deception and its details were known and/or accessible only to Volkswagen. Likewise, Volkswagen knew the facts were unknown to or not reasonably discoverable by Plaintiff or Class members.

162. In addition, Volkswagen had a duty to disclose because it made affirmative misrepresentations and/or material omissions about the qualities of its vehicles with respect to emissions standards. These include, but are not limited to, references that the vehicles are clean diesel vehicles, which were misleading, deceptive, and incomplete without the disclosure of the deception.

163. Having volunteered to provide information to Plaintiff and the Class, Volkswagen had the duty to disclose the entire truth. These omitted and concealed facts were material because they directly affect the legality, value, and performance of the Defective Vehicles purchased or leased by Plaintiff and the Class members.

164.    Volkswagen actively concealed and/or suppressed these material facts to increase its profits and market share and to avoid the perception that its Defective Vehicles did not or could not comply with federal and state laws governing clean air and emissions.  Such a perception would have been detrimental to the Volkswagen brand.

165.    Plaintiff and the Class members were unaware of the omitted material facts referenced herein, and they would not have purchased or leased the Defective Vehicles if they had known of the concealed and/or suppressed material facts.

166.    Based on the concealment of the facts, Plaintiff and the Class members have sustained damages because they were induced to purchase the illegal Defective Vehicles they now own or lease vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions, and Volkswagen's failure to timely disclose the true facts about hundreds of thousands of Volkswagen- and Audi-branded vehicles.

167.    Accordingly, Volkswagen is liable to Plaintiff and Class members for damages in an amount to be determined at trial.  Volkswagen's acts were done wantonly, maliciously, and deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class members' needs, and warrant an assessment of punitive damages, also in an amount to be determined.

## COUNT III

## BREACH OF EXPRESS WARRANTY

### (On Behalf of Plaintiff Against VW AG and VW America)

168.    Plaintiff incorporates all allegations made herein.

169.    Volkswagen's actions, as alleged above, violate the state express warranty statute in the state of Tennessee (Tenn. Code Ann. § 47-2-313).  This count is thus brought collectively on behalf of the Nationwide Class, or alternatively, the Tennessee Class.

170.    Volkswagen marketed, sold and distributed the Defective Vehicles to Plaintiff and the members of the Class in the regular course of its business.

171.    Volkswagen expressly represented and warranted, by and through statements, descriptions, and affirmations of fact made by it and its authorized agents and representatives that the Defective Vehicles were environmentally friendly and produced legal levels of emissions, all

while maintaining excellent gas mileage and high quality performance. These representations were materially false.

172.    Further, Volkswagen issued a written warranty to Plaintiff and the members of the Class in which Volkswagen warranted that the Defective Vehicles were free from defects in material and workmanship.

173.    In reliance upon these express warranties, Plaintiff and the members of the Class purchased or leased the Defective Vehicles.

174.    The Defective Vehicles failed to comply with the express warranties because they suffered from inherent defects that, from the date of purchase forward, rendered the Defective Vehicles unfit for their intended use and purpose and left them with significant defects in material and workmanship.

175.    Volkswagen knew or had reason to know that the Defective Vehicles did not conform to the express representations because the vehicles were neither efficient, environmentally friendly, usable, nor free from defects as represented.

176.    Plaintiff notified Volkswagen of the breach within a reasonable time and/or were not required to do so because affording Volkswagen a reasonable opportunity to cure its breach of written warranty would have been futile.  Volkswagen was also on notice of the defects from government investigation, research reports, and prior correspondence with the EPA and CARB.

177.    As a direct and proximate cause of Volkswagen's breach, Plaintiff and the other Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease.  Additionally, Plaintiff and the Class either have incurred or will incur economic damages at the point of repair in the form of the cost of repair, cost of increased fuel consumption, and cost of increased maintenance.

178.    Plaintiff and the Class members are entitled to legal and equitable relief against Volkswagen, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

# COUNT IV

## BREACH OF IMPLIED WARRANTY

### (On Behalf of Plaintiff Against VW AG and VW America)

179.    Plaintiff incorporates all allegations made herein.

180.    Volkswagen's actions, as alleged above, violate the implied warranty of merchantability statute in the state of Tennessee (Tenn. Code Ann. § 47-2-314).  This count is thus brought collectively on behalf of the Nationwide Class, or alternatively, the Tennessee Class.

181.    Volkswagen marketed, sold and distributed the Defective Vehicles to Plaintiff and the members of the Class in the regular course of its business.

182.    Volkswagen impliedly warranted, by and through statements, descriptions, and affirmations of fact made by it and its authorized agents and representatives that the Defective Vehicles were of merchantable quality, would pass without objection in the trade or business under the contract description, and were free of material defects and fit for the ordinary purposes for which they were to be used.

183.    In reliance upon these implied warranties, Plaintiff and the members of the Class purchased or leased the Defective Vehicles.

184.    The Defective Vehicles failed to comply with the implied warranties because they suffered from inherent design defects that, from the date of purchase forward, rendered the Defective Vehicles unfit for their intended use and purpose and made them not free from defects in material and workmanship.  Specifically, the Defective Vehicles were equipped with defective Clean Diesel engine systems.

185.    Volkswagen knew that the vehicles did not conform to the implied warranties because the vehicles were neither usable nor free from defects as represented.

186.    Plaintiff notified Volkswagen of the breach within a reasonable time and/or were not required to do so because affording Volkswagen a reasonable opportunity to cure its breach of written warranty would have been futile.  Volkswagen was also on notice of the defects from the government investigation, research reports, and prior correspondence with the EPA and CARB.

187.     Plaintiff and Class members have had sufficient direct dealings with either Volkswagen or its agents (via dealerships) to establish privity of contract between Plaintiff and the Class members.  Notwithstanding this, privity is not required in this case because Plaintiff and Class members are intended third-party beneficiaries of contracts between Volkswagen and its dealers; specifically, they are the intended beneficiaries of Volkswagen's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiff's and the Class members' Defective Vehicles are considered dangerous instrumentalities.

188.     As a direct and proximate cause of Volkswagen's breach, Plaintiff and the other Class members have suffered damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and the other Class members either have incurred or will incur economic damages at the point of repair in the form of the cost of repair, increased future fuel costs, and increased future maintenance costs.

189.     Plaintiff and the other Class members are entitled to legal and equitable relief against Volkswagen, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT V

## BREACH OF CONTRACT

### (On Behalf of Plaintiff Against VW AG and VW America)

190.     Plaintiff incorporates all allegations made herein.

191.     This claim for common law breach of contract is brought by all Plaintiff on behalf of the Nationwide Class, or alternatively the Tennessee Class.

192.     The conduct alleged herein, where Volkswagen surreptitiously installed defeat devices in the Defective Vehicles in order to fraudulently pass EPA emissions tests, constitutes a significant and material breach of contract.  The Defective Vehicles would not achieve the

performance benchmarks represented by Volkswagen without using the defeat device to fraudulently pass the EPA emissions tests.

193.     Had Volkswagen not deceived Plaintiff and the EPA, Plaintiff would not have purchased or leased the Defective Vehicles, or would not have purchased the Defective Vehicles at the premium prices that Volkswagen charged.

194.     Volkswagen's sale of these Defective Vehicles constitutes a contract between Volkswagen and the purchaser or lessee, and these contracts were breached by Volkswagen's brazen deception and decision to circumvent EPA regulations, thus inducing purchase or lease, and leaving Plaintiff with Defective Vehicles that were of greatly diminished value and/or performance, and/or increased costs.

195.     As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the other Class members are entitled to legal and equitable relief against Volkswagen, including but not limited to, damages, incidental and consequential damages, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT VI

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

### (15 U.S.C. §2301, *et seq.*)

### (On Behalf of Plaintiff Against VW AG and VW America)

196.     Plaintiff incorporates all allegations made herein.

197.     Plaintiff brings this claim on behalf of the Nationwide Class.

198.     The Defective Vehicles are "consumer product[s]" as defined in 15 U.S.C. §2301(1).

199.     Plaintiff and the Class are "consumer[s]" as defined in 15 U.S.C. §2301(3).

200.     Volkswagen is a "supplier" and "warrantor" as defined in 15 U.S.C. §2301(4)-(5).

201.     Volkswagen provided Plaintiff and the Class with numerous written warranties as described in 15 U.S.C. §2301(6).

202.     Volkswagen made implied warranties arising under state law regarding the Defective Vehicles within the meaning of 15 U.S.C. §2301(7).

203.     Volkswagen's warranties pertained to consumer products costing more than $25.

204.	Volkswagen provided Plaintiff and the Class who purchased a new Defective Vehicle with a written Manufacturer's Warranty, which provides "bumper-to-bumper" limited express warranty coverage for the lesser of 3 years or 36,000 miles. This warranty includes coverage of emission-related repairs.

205.	Additionally, Volkswagen provided a Federal Emissions Warranty to members of the Class, which covers all emissions-related parts for the lesser of 2 years or 24,000 miles, as well as an emissions warranty for the catalytic converter, engine control unit, and onboard diagnostic device for the lesser of 8 years or 80,000 miles.

206.	Volkswagen breached these warranties by selling Defective Vehicles containing defeat devices for the specific purpose of circumventing EPA emissions regulation, while surreptitiously emitting up to 40 times the legal limit of hazardous $NO_X$.

207.	In order to restrict emissions to the legal limit and deactivate the defeat device, the Defective Vehicles will need to be repaired, thus lowering the performance and/or efficiency of the Defective Vehicles. Thus, Volkswagen's breach of these warranties has deprived Plaintiff and other Class members of the benefit of their bargain.

208.	The amount in controversy of the Plaintiff's individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy for the Class meets or exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

209.	Volkswagen could have disclosed information regarding the inability of the Defective Vehicles to perform as warranted or attempted to cure its breach of warranties, but Volkswagen chose not to do so and instead chose to conceal these critical facts from Plaintiff and the Class.

210.	As a direct and proximate result of Volkswagen's conduct, Plaintiff has lost money or property by purchasing the Defective Vehicles he otherwise would not have, or paying a premium he otherwise would not have, and the Defective Vehicles have suffered a diminution in value. Plaintiff and the Class are entitled to legal and equitable relief against Volkswagen, including damages, specific performance, attorney fees, costs of suit, and other relief as appropriate.

211.     Resorting to any informal dispute settlement procedure and/or affording Volkswagen an opportunity to cure these breaches of warranties is unnecessary and/or futile.  Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Volkswagen cannot remedy the problems associated with the Defective Vehicles without significantly reducing the effectiveness of the Defective Vehicles, and, as such, permanently causing financial harm to the Plaintiff.  Any requirement – whether under the MMWA or otherwise – that Plaintiff resort to an informal dispute resolution procedure and/or afford Volkswagen a reasonable opportunity to cure its breach of warranties is redundant and excused and thereby deemed satisfied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of members of the Class, respectfully request that the Court enter judgment in his and the Class's favor and against Volkswagen, as follows:

(A)     Certification of the proposed Nationwide Class and/or Tennessee Class, including appointment of Plaintiff's counsel as Class Counsel;

(B)     An order permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

(C)     Injunctive relief in the form of a buy-back program, recall, and/or reimbursement of Defective Vehicle purchases;

(D)     Costs, restitution, damages, including treble and/or punitive damages, and disgorgement in an amount to be determined at trial;

(E)     Pre- and post-judgment interest on any amounts award;

(F)     An award of costs and attorneys' fees; and

(G)     Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

DATED:  October 19, 2015

BARRETT JOHNSTON MARTIN &
GARRISON, LLC
DAVID W. GARRISON (NO. 24968)
TIMOTHY L. MILES (NO. 21605)
SCOTT P. TIFT (NO. 27592)
JOSHUA A. FRANK (NO. 33294)

*/s/ David W. Garrison*
DAVID W. GARRISON

BOIES SCHILLER & FLEXNER LLP
DAVID BOIES
333 Main Street
Armonk, NY 10504
Telephone: 914/ 749-8200
202/749-8300 (fax)
dboies@bsfllp.com

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/ 244-2202
615/ 252-3798 (fax)
dgarrison@barrettjohnston.com
tmiles@barrettjohnston.com
stift@barrettjohnston.com
jfrank@barrettjohnston.com

BOIES SCHILLER & FLEXNER LLP
JONATHAN D. SCHILLER
DAMIEN J. MARSHALL
575 Lexington Avenue
New York, NY 10022
Telephone: 212/ 446-2300
212/446-2350 (fax)
jschiller@bsfllp.com
dmarshall@bsfllp.com

ROBBINS GELLER RUDMAN & DOWD LLP
JERRY E. MARTIN (No. 20193)
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
jmartin@rgrdlaw.com

BOIES SCHILLER & FLEXNER LLP
STEPHEN N. ZACK
100 SE Second Street
Suite 2800
Miami, FL 33131
Telephone: 305/ 539-8400
305/539-1307 (fax)
szack@bsfllp.com

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS
655 W. Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
PAUL J. GELLER
STUART A. DAVIDSON
MARK J. DEARMAN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com

Attorneys for Plaintiffs